ALDEN F. ABBOTT
*General Counsel*
THOMAS J. WIDOR
STEPHANIE COX
ADAM WESOLOWSKI
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW, Mail Drop CC-10232
Washington, DC 20580
Telephone: (202) 326-3039 (Widor)
Facsimile: (202) 326-3768
Email: twidor@ftc.gov

*Attorneys for the Federal Trade Commission*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br>    v.<br><br>THE UNIVERSITY OF PHOENIX, INC., an Arizona Corporation; and<br><br>APOLLO EDUCATION GROUP, INC., an Arizona Corporation,<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC") for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. § 53(b) to obtain temporary, preliminary, and

permanent injunctive relief, rescission or reformation of contracts, restitution, the refund

of monies paid, disgorgement of ill-gotten monies, and other equitable relief for

Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.  This action arises under 15 U.S.C. §§ 45(a) and 53(b).

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      Plaintiff FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b) and 1607(c).

## DEFENDANTS

6.      Apollo Education Group, Inc. ("Apollo"), is an Arizona corporation, with its principal place of business at 4025 S. Riverpoint Parkway, Phoenix, AZ, 85040. Apollo Education Group formerly was known as Apollo Group, Inc.  Apollo transacts or has transacted business in this district and throughout the United States.  Apollo is the

parent company of The University of Phoenix, Inc.  At all times material to this
Complaint, with respect to the acts and practices of The University of Phoenix, Inc. that
are described below, Apollo dominated or controlled those acts or practices, knew of or
approved those acts and practices, or benefited from those acts and practices.

7.      The University of Phoenix, Inc. ("UOP") is an Arizona corporation, with its
principal place of business at 4025 S. Riverpoint Parkway, Phoenix, AZ, 85040.  UOP
transacts or has transacted business in this district and throughout the United States.  At
all times material to this Complaint, acting alone or in concert with others, UOP has
advertised, marketed, distributed, or sold educational products and services to consumers
throughout the United States.

## COMMERCE

8.      At all times material to this Complaint, Apollo and UOP (collectively
"Defendants") have maintained a substantial course of trade in or affecting commerce, as
"commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

9.      Since at least 2012, Defendants have deceptively advertised the benefits of
a UOP education.  Specifically, through the use of television, radio, and internet
advertisements and other marketing materials, some of which have been part of the "Let's
Get to Work" advertising campaign, Defendants have misrepresented to consumers that:
(i) UOP's relationships with companies, such as Adobe, Microsoft, and Twitter, create
career or employment opportunities specifically for UOP students, and (ii) UOP has
worked with such companies to develop curriculum.  These representations are false or

misleading.

### Overview of Defendants' Business and Advertising

10.     Apollo operates UOP, a private, for-profit post-secondary educational institution, which has approximately 55 campuses throughout the United States.  Though UOP offers both in-person and online classes, most UOP students attend class exclusively online.  UOP offers certificate courses and associate, bachelor's, master's, and doctoral degree programs.

11.     UOP has charged consumers tuition ranging from about $7,400 to $19,400 per year, depending on the program.

12.     Since 2012, UOP's net revenue has exceeded $13.5 billion.  Apollo, during that same time, derived between 78% to 91% of its annual net revenue from UOP.

13.     Apollo and UOP have relied heavily on advertising to attract students to UOP, including specific advertisements targeting military and Hispanic consumers. Apollo and UOP have spent over $1.7 billion on advertising and marketing between fiscal years 2013 and 2015 alone.

14.     Prior to 2012, Defendants' advertising campaigns for UOP primarily had emphasized factors such as flexibility, convenience, online coursework, and accreditation.  By early 2012, however, Defendants' market research indicated that this advertising no longer differentiated UOP from its competitors, which were touting similar benefits.

15.     Additionally, according to SEC filings and internal documents, UOP's enrollment numbers were declining due to increased competition for students.  The

average enrollment in degree programs at UOP between 2010 and 2012 dropped from approximately 460,900 to 356,900 students.

16.     Many students enrolled in 2012 or 2013 have not yet earned a UOP degree. Nearly 62% of first-time students and 80% of non-first time students drop out of UOP instead of earning a degree.  Further, on average, it takes students enrolled at four-year, private, for-profit schools nearly nine calendar years to earn a bachelor's degree.  Indeed, according to one internal document involving UOP's Military Division, "[m]ost individuals when thinking of post-secondary education assume it will take 4 years. However, if an individual is working full-time or raising a family, it can take up to 14 years on average!"

### Defendants' "Let's Get To Work" Advertising Campaign

17.     In 2012, based on market research, Defendants adopted an advertising strategy focused on claims connecting a UOP education with successful career or employment outcomes.  Defendants' research showed that many students decide to enroll in post-secondary programs because of the potential for career success, including the belief that an education will get them a job or a better salary.  But Defendants' research also showed that "consumers currently do not consider UOP to be their top choice. . . because they do not believe UOP education will provide them the career outcome advancements they desire."

18.     Defendants released a new advertising campaign in late summer 2012 to change this perception.  Titled "Let's Get To Work," the campaign featured numerous high-profile corporate employers, such as Microsoft, Twitter, Adobe, and Yahoo!.  The

overarching goal of the campaign has been to convince consumers that UOP students experience career success because of UOP.  Specifically, Defendants have represented that UOP has worked with companies to create career or employment opportunities for UOP students and that UOP has worked with companies, such as Adobe, Microsoft, and Twitter, to develop curriculum oriented to the companies' job needs.

19.    In reality, these companies were not working with UOP or Apollo to create job options for UOP students or to develop curriculum.

20.    Instead, Defendants selected companies to feature in their advertisements based on desired brand association.  The strategy was to focus on "large, stable, technology-based, forward-focused companies with great reputations" because these companies drove the highest level of prospective student interest.

### *"Parking Lot" Television Ad*

21.    A copy of an advertisement, known as "Parking Lot," that Defendants have widely disseminated, or caused to be disseminated, on numerous television stations, commencing around October 15, 2012, is attached as Exhibit A.  A transcript of this advertisement is attached as Exhibit B.

22.    Narrated by Phylicia Rashad, known for her television role as Clair Huxtable, a successful attorney who balances work with family on *The Cosby Show*, Ms. Rashad's voice can be heard saying as the ad begins: "Like a lot of things, trying to find a better job can be frustrating, so at University of Phoenix we're working with a growing list of almost 2,000 corporate partners, companies like Microsoft, American Red Cross, and Adobe, to create options for you."  During this voiceover, a woman driving around a

6

full parking lot looks frustrated at the lack of open spaces.



23.    As Ms. Rashad states that UOP is working with companies "to create options for you," cars are lifted out of parking spaces and company logos for Microsoft and American Red Cross appear in the open spots, representing employment for UOP students at these companies:



The driver passes additional, newly opened parking spaces for Avis, MGM Resorts International, Hitachi Data Systems, AT&T, and Newell Rubbermaid.

24.    Ms. Rashad concludes by stating:  "Not only that, we're using what we learn from these partners to shape our curriculum so that when you find the job you want, you'll be a perfect fit.  Let's get to work."  As she makes this statement, the driver finds a space and parks in it:



25.     Another version of the "Parking Lot" advertisement that Defendants have widely disseminated, or caused to be disseminated, on numerous television stations replaced the Hitachi logo with a Twitter logo.  A copy of the advertisement is attached as Exhibit C.  A transcript of this advertisement is attached as Exhibit D.

26.     In reality, the companies referenced in the "Parking Lot" advertisement did not have relationships with UOP or Apollo to create job options for UOP students or to develop curriculum.  Many of the "2,000 corporate partners," including the specific companies referenced in the "Parking Lot" advertisement, were what Defendants referred to as "Workforce Solutions" (WFS) partners—companies whose own employees received a tuition reduction benefit from UOP in exchange for the companies promoting Defendants' academic programs.

27.     Some companies raised concerns with Defendants that the advertisements were misleading.  On August 28, 2012, for example, Staples, which had been asked to participate in the "Parking Lot" advertisement, questioned: "What is Staples doing as part of this program?  The [Parking Lot] TV spot makes it sounds [sic] like we are guiding curriculum – we just want to make sure we accurately portray our specific role in this

8

program."  Staples did not participate in the "Parking Lot" ad.

28.     In addition to companies raising concerns, the Senior Vice President responsible for UOP's Workforce Solutions team complained in September 2012 to UOP's Chief Marketing Officer, who led the Let's Get to Work campaign, that Adobe's placement in the "Parking Lot" advertisement was "smoke & mirrors."  The Senior VP explained, "they are not a partner.  We may do business with them, but nothing academically or PCS [Phoenix Career Services] wise either."

29.     Notwithstanding the misleading nature of the ads, UOP's Chief Business Operating Officer reported to the marketing team that he had presented the ad campaign to the Apollo Board for its review and that the Board was "completely supportive of our strategies to differentiate UOPX."  He further "assure[d]" the team that the "Let's Get to Work" campaign had the "total support" of Defendants' founder, who also was the Apollo Board Chairman at the time, as well as his son, who subsequently took over as Chairman in December 2012.

30.     In December 2012, the UOP Chief Business Operating Officer admitted that using Twitter in the ad campaign had "nothing to do" with the Workforce Solutions agreement and "probably never will."  He continued that, while UOP did not have a deal with Twitter to co-brand courses, it would work towards obtaining one, and meanwhile Twitter was a priority because it "is one of the most recognized brands in the market."  The Chief Business Operating Officer stated it was a "[s]imilar story with Adobe."

31.     Through its PCS program, Defendants received permission to feature company logos and to post job listings from some of these companies.  Listings in UOP's

9

career portal were not unique or specifically for UOP students but were widely available through other public sources. For example with Twitter, one UOP marketing executive directed that the WFS team "go to twitter.com/jobs and hand-select more updated listings to post" on UOP's career portal after noting that UOP had only one new posted job for Twitter. When the WFS team declined, the marketing executive personally took "time out of [her] schedule tonight/tomorrow to hand-select job listings."

### *"Train Stops" Television Ad*

32.    Another advertisement disseminated on numerous television stations as part of Defendants' "Let's Get To Work" campaign, titled "Train Stops," is attached as Exhibit E. A transcript of this advertisement is attached as Exhibit F. "Train Stops" debuted during the Grammys on February 10, 2013. Internal documents indicate that the purpose of the "Train Stops" advertisement was to highlight that UOP's corporate partners connect UOP students with meaningful employment opportunities.

33.    As the scene opens inside a subway train, Ms. Rashad states: "At University of Phoenix, we know the value of your education is where it can take you." The camera focuses on a female passenger looking up at a station map depicting logos of top companies, including Waste Management, the American Red Cross, Methodist Hospital System, and Adobe:



34.     The station map shows the train arriving at Methodist Hospital System.  A female voice states, "Now arriving, city hospital," and a man in medical scrubs and a woman in a business suit are shown leaving the train and entering a hospital:



A blue billboard in the right corner states, "Get your foot in a few thousand doors."

35.     The advertisement next shows additional company logos, including AT&T, and turns to show the female passenger disembarking at her destination.  As she does so, the voiceover concludes:  "Which is why we are proud to help connect our students with leading employers across the nation.  Let's get to work."

36.     A UOP survey designed to gauge how well the ads delivered the intended message validated that the advertisement "conveys a compelling message that suggests

11

that an education with UOPX opens doors and that UOPX can help them find jobs with specific corporate partners."

37.     In reality, Apollo and UOP's relationships with "leading" employers or companies, including the corporate partners referenced in the "Train Stops" ad, did not create job opportunities for UOP students.  UOP merely engaged a third-party provider to host an online portal that included job listings from some of these companies.  Most, if not all, of the job listings were in fact widely available to non-UOP students.

*"Hall of Success" Television Ad*

38.     Defendants have widely disseminated, or caused to be disseminated, on numerous television stations beginning around July 29, 2013, an advertisement known as "Hall of Success," which is attached as Exhibit G.  A transcript of this advertisement is attached as Exhibit H.

39.     In the opening scene of this advertisement, the camera zooms in on two heavy oak doors that open to reveal a wall covered in gilded frames.  Ms. Rashad states: "The Hall of Success.  Here we honor the proud accomplishments of our students and alums."  In each frame is a person and a company logo, representing UOP alumni at various top employers such as the American Red Cross, CBS Radio, Microsoft, and Yahoo!.

40.     After identifying "Maria Salazar" at the American Red Cross and "Garlin Smith" at Yahoo!, Ms. Rashad states: "And for every Garlin, thousands more are hired by hundreds of top companies."  As she makes this statement, the camera pans to show a vast hall with hundreds of additional gilded portraits:

12



Ms. Rashad concludes: "That's right. University of Phoenix. Enroll now. We have a frame waiting for you."

41.    UOP's Chief Marketing Officer described the "Hall of Success" ad as a natural follow up to "Parking Lot" and "Train Stops" and their corporate partner messaging by associating names and faces with these well-known companies.

42.    In reality, hundreds of top companies did not regularly hire thousands of UOP students because of UOP's relationships. In fact, many UOP students were employed by those companies *prior to or at the time* they attended UOP or were hired regardless of their graduation from UOP.

43.    For example, an alumnus depicted in the ad as employed at the American Red Cross joined the organization in 1997 and obtained a Master's degree from UOP in 2005 while already working at the American Red Cross for nearly eight years.

44.    Indeed, Defendants knew that many UOP students or graduates were already working at their respective companies before enrolling in UOP and that UOP's relationship was not the reason for their employment at the company. One UOP

employee observed that, contrary to the hiring claims made in the "Hall of Success" ad, many of the alumni "earned their degree while at the company and remained with the company after obtaining their degree."

### Curriculum Radio Ad

45.     In a 2013 radio advertisement, Defendants again touted UOP's relationships with particular companies, representing that these companies worked with UOP to design curriculum.  The advertisement prominently claimed:

> If you want to know how to get hired, it pays to go right to the source.  At University of Phoenix we're talking to companies like AT&T, Sodexo, and Adobe about what they're looking for in future employees.  They're helping us shape our curriculum to make sure today's classes help prepare you to pursue tomorrow's jobs.

A true and correct copy of the radio advertisement is attached as Exhibit I.  A transcript of this advertisement is attached as Exhibit J.

46.     In reality, AT&T, Sodexo, and Adobe did not work with UOP to develop curriculum that would prepare students for jobs at those companies.

### Internet Ads & Claims

47.     Defendants also have made the deceptive claims about employment opportunities and curriculum via digital ads, social media posts, and representations on their websites.  Defendants disseminated and advertised the "Let's Get to Work" advertisements, including the advertisements described above, on internet sites such as Facebook, Twitter, and YouTube.  As a result of these efforts, the advertisements have garnered more than a billion impressions on social media channels such as Facebook, Twitter, and YouTube.

14

48.     For example, on or around October 16, 2012, UOP claimed in a Facebook post that UOP is working with almost 2,000 corporate partners to provide job opportunities to UOP students and touted "Corporate Partnerships Shaping Curriculum":



A true and correct copy of the Facebook post is attached as Exhibit K.

49.     In February 2017, a UOP employee publicly responded in a Facebook post to an alumnus who was having difficulty landing a job, expressing "concern" about his experience because UOP had "over 3,000 educational and industry partnerships" providing career opportunities to UOP students and alumni and "over 600K Phoenixes who've found success with their careers on LinkedIn":



A true and correct copy of the Facebook screen capture with the Facebook user's name and photo redacted is attached as Exhibit L.

50.     Similarly, Defendants have featured digital ads and banners on the internet representing that their relationships with companies provided students with job opportunities.



A true and correct copy of the advertisement is attached as Exhibit M.

51.     Calling certain companies "Employer Partners," UOP's website has represented that UOP's relationships with these companies create employment opportunities for students.  Defendants also have represented on their website that UOP's curricula was "developed in collaboration with industry leaders to help cultivate skills valued by employers."  These claims have been made in proximity to logos of nine recognizable companies, including seven Fortune 500 companies.



A true and correct copy of this webpage is attached as Exhibit N.

*Ads Targeting Current and Former Military Members*

52.     Defendants also have made deceptive claims about employment opportunities in ads to current and former military members.  UOP has been the largest recipient of Post-9/11 GI bill benefits since the program's inception.  For example, UOP received over $271 million in 2012-2013 alone.

53.     UOP created and disseminated an advertisement around February 21, 2013 that claimed UOP's corporate partnerships with companies like AT&T and Allied Barton offered hiring programs for UOP students who were veterans:



A true and correct copy of this advertisement is attached as Exhibit O.

54.     In reality, Defendants' relationships with these companies did not create employment opportunities for UOP students who were current or former military members.  The companies' hiring programs were open to all veterans and were not a

result of their status as UOP "corporate partners."

*Enrollment Advisor Claims*

55.     Beginning in or around September 2012, in conjunction with its "Let's Get To Work" advertisements, Defendants rolled out talking points and encouraged employees, including enrollment advisors, to communicate these false or misleading messages to students and prospective students.

56.     Defendants routinely sent links to the advertisements along with a campaign overview to all employees.  A one-sheet summary of the campaign talking points for *Hall of Success* included the claim that "Corporate Partnerships" are "Providing job opportunities and helping shape our curriculum."  Defendants also tasked employees, some dubbed "Phoenix Champions," with messaging the campaign and provided talking points to various UOP teams, including enrollment advisors, academic counselors, finance advisors, call center employees, and other student or prospective student facing employees.  The talking points claimed that UOP's relationships with corporate partners, including many Fortune 500 companies, provided an "inside track" and a "competitive advantage to our students."  As proof that these relationships were working, Defendants directed employees to claim that alumni were being hired by "hundreds of top companies like Microsoft, Yahoo!, American Red Cross and CBS."  Additional talking points described the online jobs portal as providing "[a]ccess to unique job opportunities and connections exclusive to University of Phoenix Students."  In fact, UOP portal listings were not unique or specifically for UOP students but were widely available to non-UOP students.

57.     At Defendants' behest, UOP enrollment advisors began telling prospective students that companies, including Fortune 500 companies, hired UOP students because of the school's partnerships.  For example, in March 2013, enrollment advisors represented to callers inquiring about UOP that the school has "over 2,000 partners in the local area. . . they hire our students first and from there they go on," and that UOP has "over 2,000 corporate partners and national industry partners that are looking specifically at University of Phoenix students to hire instead of any other schools."

58.     Another UOP enrollment advisor represented to a caller who said she was a military spouse that "we work with hundreds of companies out there… where we have direct relationships."  After specifically citing Microsoft and IBM, he added that UOP's website listed "job opportunities for those companies that we have direct relationships with."  The employee further claimed that UOP was working with these companies' executives and "trying to adjust our curriculum. . . so when our students go and interview for the job they can say, well, I went to University of Phoenix, I got these competencies, and that's exactly what they are looking for."

59.     In reality, the companies were not specifically hiring UOP students over other candidates and were not working with UOP to develop tailored curricula; the partnerships were primarily marketing relationships that did not create jobs or curricula for UOP students.

## Claims Regarding Relationships With Corporate Partners

60.     The "Let's Get To Work" campaign prominently touted that UOP's relationships with companies, such as Adobe, the American Red Cross, Avis, AT&T,

Hitachi, MGM, Microsoft, Newell Rubbermaid, Sodexo, Twitter, and Waste

Management, create job opportunities specifically for UOP students.

61.     Defendants' WFS and PCS agreements with these companies did not create

or provide job opportunities for UOP students.  Any benefits from the WFS relationships

applied to current employees of the companies who would be able to attend UOP at a

reduced cost.

62.     Moreover, the job opportunities posted for PCS partners were not unique to

UOP students, and in fact, were widely available on other websites or were simply copied

by UOP employees into the UOP career portal.

63.     Defendants knew that these relationships were not the reason for UOP

students' career outcomes.  One UOP employee cautioned that the career message central

to the campaign should be emphasized when UOP had the "ability to deliver career

outcomes"—which it did not have.  Similarly, a UOP executive warned that "[w]e have

to be able to deliver what we promise in the ads."  In January 2014, well more than a year

after the campaign's launch, UOP's Vice President of Brand Marketing also

acknowledged that "[w]e all agree that our current advertising messaging is a bit light on

support."

64.     Defendants conducted annual alumni surveys that asked about employment

outcomes.  The 2013 alumni survey showed that approximately 60% of UOP students

stayed with their same employer after graduation.  In fact, the survey found "a significant

disparity" between alumni expectations for obtaining a new job and the reality of

obtaining a new job *with any company* based on a UOP degree.

## Claims Regarding Curriculum Development

65.     Defendants also have represented that UOP has worked with companies, such as Adobe, the American Red Cross, Avis, AT&T, MGM, Microsoft, Newell Rubbermaid, Sodexo, and Twitter, to develop curriculum.

66.     In reality, these companies did not work with Defendants to develop curriculum.

67.     In fact, Defendants were aware that the claim was baseless.  In November 2012, a UOP Senior Vice President alerted numerous employees, including UOP and Apollo executives, that the "Let's Get to Work" campaign was creating "misconceptions," including that companies were working with UOP to develop its curriculum.  The Senior VP explained that UOP is not "working directly with companies one at a time and/or creating custom curriculum based upon their needs."

68.     Similarly, in an October 24, 2012 email chain, Apollo and UOP employees discussed how Defendants "have not worked with Microsoft yet," even though Defendants already had begun broadcasting ads, including "Parking Lot," that claimed the company was working with UOP to develop curriculum.

69.     Rather than work with the companies touted in its advertisements, Defendants have relied on a list of standard job competencies generated by a third-party human resources company.  This third-party framework identifies general skills and traits (such as "leading and deciding," "adapting and coping," and "organizing and executing") associated with particular jobs and industries.  Defendants' employees simply matched those general skills and traits with its academic programs.  Contrary to what Defendants

promised, this third-party framework does not reflect input from companies, such as Adobe, Microsoft, or Twitter, about their specific needs.

## Defendants' Claims Materially Influenced Consumers

70.    Defendants' research showed that employment prospects associated with a post-secondary education were important factors for many consumers deciding whether to enroll at UOP.

71.    While developing the "Let's Get to Work" campaign, UOP surveyed the influence of its advertisements on consumers.  According to one survey, "[t]he key compelling aspect of th[e] ["Parking Lot"] spot was the communication of UOP's partnership with 1,200 large corporations.  These partnerships serve to inspire consumers to consider UOP and also served to validate/legitimize UOP as a brand."

72.    By January 22, 2013, as UOP continued to roll out its "Let's Get To Work" campaign, the UOP Senior Vice President for University Strategy reported to the President's Cabinet (a group of UOP executives advising UOP's President) that the "repositioning of UOPX as connecting education to careers (E2C) appears to be paying off.  Early results indicate significantly improved conversion rates, but it will take some time to see if this boosts retention and ultimately share."

73.    Another study conducted around May 24, 2013 reported that the "Let's Get to Work" advertising campaign, including claims about "[r]elationships with leading employers and a dynamic curriculum designed with their input," increased the percentage of consumers who would consider attending UOP from 12% to 29%.

74.    UOP's and Apollo's Boards and executives continued tracking the

campaign's effectiveness in increasing "consumer consideration" of UOP.

75.     Based on Defendants' continued use of the practices challenged above after learning of the Commission's investigation; Defendants' continued heavy reliance on advertising to attract students to UOP; and the ease with which Defendants can engage in similar conduct; the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.  With respect to conduct that has ceased, Defendants retain the ability and incentive to engage in similar conduct.  For example, as described in paragraphs 70-73, these misrepresentations involve a central motivating factor for enrolling in UOP—career success.

## VIOLATIONS OF THE FTC ACT

76.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

77.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### COUNT I:

### Misrepresentations Regarding Relationships With Corporate Partners

78.     Through the means described in Paragraphs 17-59, Defendants have represented, directly or indirectly, expressly or by implication, that University of Phoenix's relationships with companies, such as Adobe, Microsoft, and Twitter, create career or employment opportunities specifically for University of Phoenix students.

79.     The representation set forth in Paragraph 78 of this Complaint is false or misleading.

80.     Therefore, the making of the representation as set forth in Paragraph 78 of this Complaint constitutes a deceptive act or practice, in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II:
### Misrepresentations Regarding Curriculum Development

81.     Through the means described in Paragraphs 18-37, 45-48, 51, and 55-59, Defendants have represented, directly or indirectly, expressly or by implication, that University of Phoenix worked with companies, such as Adobe, Microsoft, and Twitter, to develop curricula.

82.     The representation set forth in Paragraph 81 of this Complaint is false or misleading.

83.     Therefore, the making of the representation as set forth in Paragraph 81 of this Complaint constitutes a deceptive act or practice, in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

84.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

85.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and

redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

<b>PRAYER FOR RELIEF</b>

Wherefore, Plaintiff Federal Trade Commission, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendants and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a temporary and preliminary injunction;

B.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: December 10, 2019                    Respectfully submitted,


                                            ALDEN F. ABBOTT
                                            General Counsel


                                            */s/ Thomas J. Widor*___
                                            THOMAS J. WIDOR
                                            Email: twidor@ftc.gov
                                            STEPHANIE COX
                                            Email: scox@ftc.gov
                                            ADAM WESOLOWSKI
                                            Email: awesolowski@ftc.gov
                                            FEDERAL TRADE COMMISSION
                                            600 Pennsylvania Ave., NW
                                            Mail Drop CC-10232
                                            Washington, DC 20580
                                            Telephone: (202) 326-3039 (Widor)
                                            Facsimile: (202) 326-3768

                                            Attorneys for Plaintiff
                                            FEDERAL TRADE COMMISSION